**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES ALLEN, individually and on behalf of all others similarly situated, | **Case No. 1:25-06037** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SYNCHRONY FINANCIAL, | |
| Defendant. | |

Plaintiff James Allen ("Plaintiff") brings this action individually and on behalf of all others similarly situated ("Class Members") against Synchrony Financial ("Defendant" or "Synchrony").  Plaintiff's allegations are based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all individuals who have accessed and used synchrony.com (the "Website") to apply for a loan or credit card.

2.      Defendant provides financial services to consumers through the Website, where consumers can manage and apply for credit cards, loans, and select payment plans.  To apply for one of Defendant's financial products, users must share personally identifying information. When consumers provide this information on their applications, they expect that such confidential information and activity will be protected and not disclosed to unknown third parties.  Such expectations are based, in part, on the legal protections afforded to such information.  Such expectations are also based on Defendant's express representations that it will not utilize online tracking technology in a way that identifies consumers.

1

3.       Despite reasonable expectations of privacy, and Defendant's legal duties to prevent the disclosure of such private information, Defendant intercepts and discloses information provided by consumers on loan and credit card applications to LinkedIn Corporation ("LinkedIn") and Meta Platforms, Inc. ("Facebook").  These disclosures include communications that contain sensitive and confidential information – i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA").

4.       Through the acts alleged herein, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, et seq. ("ECPA") and New York General Business Law § 349 ("GBL"), by disclosing Plaintiff's and Class Members' private and confidential information without consent and contrary to Defendant's representations of confidentiality.

## THE PARTIES

5.       Plaintiff James Allen is a New York citizen residing in Staten Island, New York. On or around May 2025, Plaintiff applied for a Synchrony Premier World Mastercard through the Website.  Before applying, Plaintiff viewed Defendant's statement about "Your Privacy," which read in part, "When you use our site, it may store or retrieve information about your interactions, your preferences and your device. This information is used to make the site work properly. The information does not directly identify you but provides a more personalized site experience." *See* paragraph 17 and Figure 1, *infra*.

6.       Plaintiff applied for the credit card through the Website using the same device and browser used to access his LinkedIn and Facebook accounts.  When creating his LinkedIn account and Facebook account, Plaintiff provided certain information to LinkedIn and Facebook, including his full name.  Unbeknownst to Plaintiff, Defendant disclosed his personally

2

identifiable information ("PII") to both LinkedIn and Facebook—through "electronic communications" as defined by ECPA—that contained Plaintiff's confidential, "nonpublic personal information" as defined by the GLBA. Plaintiff did not consent to the interception and disclosure of his private and protected information.

7. Plaintiff relied upon Defendant's express representations of confidentiality and would not have applied for a credit card on Defendant's Website nor would he have provided his personal information to Defendant if Plaintiff knew that Defendant disclosed information about his creditworthiness and the financial products he was applying for to third parties. Such acts are an egregious violation of Plaintiff's privacy.

8. Defendant Synchrony is a Delaware corporation with its principal place of business at 777 Long Ridge Road, Stamford, CT 06902. Defendant is a provider of financial products and services including bank accounts, credit cards, and loans, to individuals throughout the United States, including in New York. Defendant also provides a variety of financial services to New Yorkers, whom it knows to reside in the State based on address information that individuals must provide in order to open an account or apply for a financial product or service with Synchrony. Defendant chose to embed the LinkedIn Insight Tag and the Facebook Tracking Pixel on its Website, which it owns and operates.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class

3

members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

10.     This Court has personal jurisdiction over the parties because Plaintiff resides in New York, is a New York citizen, and submits to the jurisdiction of the Court.  Further, the Defendant has, at all times relevant hereto, systematically and continually conducted business in New York, including within this District, and intentionally availed itself of the benefits and privileges of the New York consumer market through the promotion, marketing, and operation of its services to residents within this District and throughout New York.  Additionally, Plaintiff, while within New York, applied for a credit card through Defendant's Website.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this District.

<b><u>FACTUAL BACKGROUND</u></b>

**A.      The Gramm-Leach-Bliley Act**

12.     As Congress recognized, "nonpublic personal information" is confidential.

13.     Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

    (i)        Personally identifiable financial information; and

    (ii)       Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

14.     Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

    (i)        A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

4

> (ii)     About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or
>
> (iii)    [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

> (A)    Information a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service;
>
> (B)    Account balance information, payment history, overdraft history, and credit or debit card purchase information;
>
> (C)    The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];
>
> (D)    Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;
>
> (E)    Any information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and
>
> (F)    Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

15.    Pursuant to 16 C.F.R. § 313.3(k)(1):

a financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

Pursuant to 16 C.F.R. § 313.3(k)(1), Synchrony is a financial institution.

**B.      Defendant's Privacy Representations**

16.      Defendant owns and operates the Website.  Unbeknownst to users, Defendant integrated the LinkedIn Insight Tag and the Facebook Tracking Pixel (collectively the "Tracking Technologies") into the Website to assist with its marketing efforts.

17.      When consumers access the Website, a banner appears that claims Defendant's Website retrieves consumers' information only to make the site work properly. In that same banner, Defendant assures consumers that the information "does not directly identify" them, and that their electronic communications will remain confidential.



*Figure 1*

18.      As shown above, Defendant claims that it retrieves consumers' information solely to maintain its Website's functionality. It further represents that consumers' information will not personally identify them.

19.      Despite promising to keep electronic communications confidential, Defendant

6

systematically discloses such information to numerous third parties.

20.     As courts across the country have recognized, the identifiers that the Tracking Technologies capture—email address, phone number and social media IDs—constitute "directly personal information." By capturing this information anyway, Defendant fails to receive consent from visitors to intercept their communications.

### C.     Overview of the Defendant's Website

21.     On Defendant's Website, users can, *inter alia*, search for and apply for financial products and services, including credit cards and loans. When doing so, Website users provide Defendant with confidential information, including "nonpublic personal information" under the GLBA, such as their PII and information about their financial activity with Synchrony (e.g. application status).

22.     Unbeknownst to Plaintiff and Class Members, however, Defendant intercepts their private communications through its use of the LinkedIn's Insight Tag and the Facebook Tracking Pixel. Defendant also discloses the information it intercepts through the LinkedIn Insight Tag and Facebook Tracking Pixel to LinkedIn and Facebook for targeted advertising purposes.

23.     Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (i.e., the confidential communications are not procedurally or automatically generated). As set out below, confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended

messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

**D.      Defendant Intercepts and Discloses Consumers' Private Information Through LinkedIn's Insight Tag**

**i.      LinkedIn's Platform and Business Tools**

24.      LinkedIn markets itself as "the world's largest professional network on the internet[.]"[1]   But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network.  LinkedIn has moved into the marketing and advertising space, and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[2]  Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[3]

25.      According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates." [4]  Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[5]  LinkedIn's "marketing solutions allow advertisers to select

---

[1] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?,
https://www.linkedin.com/help/linkedin/answer/a548441#.

[2] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[3] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023),
https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[4] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3,
https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.
[5] LINKEDIN, *supra* note 2.

specific characteristics to help them reach their ideal audience.  The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[6]

26.    As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[7]

27.    The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[8]

28.    Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including banks and financial institutions, to target potential customers.[9]

29.    For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach

---

[6] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[7] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[8] *See id.*

[9] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

millions of professionals across multiple touchpoints."[10]  According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[11]

30.    In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[12]  That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[13]

31.    According to LinkedIn, the LinkedIn Insight Tag, also called the Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[14]  LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[15]

32.    LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[16]  A critical feature allows the LinkedIn Insight Tag to

---

[10] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[11] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[12] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[13] Dencheva, *supra* note 3.

[14] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[15] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[16] LINKEDIN, *supra* note 3.

track users, even when third-party cookies are blocked.[17]   LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[18]  Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn.  Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its Pixel.[19]  Instead, the LinkedIn Pixel is shielded with the same privacy exemptions offered to first-party cookies.

33.     When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

34.     These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

35.     The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies.  Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[20]

36.     For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[21]  Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[22]

37.     A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details.  Based on information it

---

[17] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[18] *See id.*

[19] *See id.*

[20] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[21] *See id.*

[22] *See id.*

obtains through the LinkedIn Pixel, Defendant LinkedIn is able to target its account holders for advertising.

38.    LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully-disclosed information.  In fact, LinkedIn expressly warrants the opposite.

39.    When first signing up, a user agrees to the User Agreement.[23]  By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[24] and the Cookie Policy.[25]

40.    LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[26]

41.    The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[27]  LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[28]

42.    However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[29]

---

[23] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[24] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[25] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[26] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[27] *Id.*

[28] *Id.*

[29] *Id.* (emphasis added).

43.     Therefore, LinkedIn does not receive consent from its accountholders to intercept their private, protected communications.

44.     Nonetheless, Defendant intentionally intercepts and discloses sensitive and private information to LinkedIn through its use of the LinkedIn Insight Tag in violation of state and federal privacy laws.

45.     Users never choose to have their sensitive information disclosed to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

**ii.     Defendant's Use of the LinkedIn Insight Tag**

46.     At all relevant times Defendant's Website utilized the LinkedIn Insight Tag.

47.     Through the LinkedIn Insight Tag, Defendant shared its applicants' identities and online activity, including information related to consumers seeking to procure financial products and/or services, with one of the world's largest social media companies for targeted advertising purposes.

48.      Defendant allows and encourages consumers to apply for financial services on its Website.  Consumers can hover over the "Financing" button to reveal a drop-down menu of credit card options.



*Figure 2*

49.      Once a user selects a credit card from the menu, they are taken to another screen with information about the cards' benefits. If a user then clicks "Learn More" to access further information or clicks "Apply Now" to begin the application process, Defendant discloses the fact that the consumer is applying for a credit card to LinkedIn.



*Figure 3*

Data:
{
        "pids": [3005244],
        "scriptVersion": 255,
        "time": 1757364156061,
        "domain": "synchrony.com",
        "url": "https://synchrony.com/financing/synchrony-mastercards#synchrony-cc-contaier",
        "pageTitle": "Synchrony Premier Mastercard | Synchrony Bank",
        "websiteSignalRequestId": "395e0163-2d91-6208-1251-2bcdac558d6e",
        "isTranslated": false,
        "liFatId": "not_available",
        "liGiant": "",
        "misc": {
                "psbState": -4
        },
        "isLinkedInApp": false,
        "hem": null,
        "signalType": "CLICK",
        "href":
"https://apply.syf.com/SYFMCPREM?intcmp=NoOff_SYFMCPREM_creditcard_synchrony_premier_apply
_int&mySYFSERDYID=-****-****-****-****",
        "domAttributes": {
                "elementSemanticType": null,
                "elementValue": null,
                "elementType": null,
                "tagName": "A",
                "backgroundImageSrc": null,
                "imageSrc": null,
                "imageAlt": null,
                "innerText": "APPLY NOW",
                "elementTitle": null,
                "cursor": "pointer"

*Figure 4*

15

**E.      Defendant Intercepts and Discloses Consumers' Private Information Through and the Facebook Tracking Pixel**

**i.      Facebook's Platform and Business Tools**

50.      Facebook describes itself as a "real identity platform,"[30] meaning users are allowed only one account and must share "the name they go by in everyday life."[31]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[32]

51.      In 2023, Facebook generated over $134 billion in revenue.[33]  With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[34]

52.      Facebook sells advertising space by highlighting its ability to target users.[35]  Facebook can target users effectively because it surveils user activity on and off its site.[36]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their

---

[30] Sam Schechner & Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL ST. J. (Oct. 21, 2021, 4:05 PM), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

[31] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[32] FACEBOOK, SIGN UP, https://www.facebook.com.

[33] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2023 RESULTS; INITIATES QUARTERLY DIVIDEND, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend-2024.pdf at 8.

[34] *Id.*

[35] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[36] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

"interests," "behavior," and "connections."[37]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[38]

53.    Advertisers can also build "Custom Audiences."[39]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[40]  With Custom Audiences, advertisers can target existing customers directly and build "Lookalike Audiences," which "leverage[] information such as demographics, interests and behaviors from your source audience to find new people who share similar qualities."[41]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: (1) by manually uploading contact information for customers or (2) by utilizing Facebook's "Business Tools."[42]

54.    As Facebook puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who

---

[37] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[38] FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[39] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[40] FACEBOOK, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[41] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[42] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

might be interested in their products and services."[43]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

55.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[44]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[45]  Advertisers can even create their own tracking parameters by building a "custom event."[46]

56.    One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to companies like Synchrony to integrate into their website.  As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[47]  When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to

---

[43] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[44] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[45] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[46] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[47] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

Facebook's servers.  This second secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Synchrony's Website— Synchrony's own code and Facebook's embedded code.

57.     Synchrony chose to include the Facebook Tracking Pixel on its Website.

58.     Facebook's own documentation makes clear how extensively the Facebook Tracking Pixel tracks private information.  It describes the Facebook Tracking Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the right people[] [and] *[f]ind . . . people who have visited a specific page or taken a desired action on your website*" (emphasis added).[48]

59.     Facebook instructs such business customers that:

Once you've set up the [Facebook Tracking] Pixel, *the pixel will log when someone takes an action on your website*.  Examples of actions include adding an item to their shopping cart or making a purchase.  *The Pixel receives these actions, or events*, which you can view on your [Facebook Tracking] Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. *You'll also have options to reach those customers again through future Meta ads*.[49]

60.     This tracked information includes private data revealing credit card application information provided by consumers on the Website.

61.     The Facebook Tracking Pixel code enables Facebook not only to help Synchrony with advertising to their own users, credit card holders, and/or financial services applicants outside the Website, but also includes individual users, credit card holders, and/or financial

---

[48] META, ABOUT META PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[49] *Id.* (emphasis added).

services applicants among groups targeted by *other* Facebook advertisers relating to the financial services about which those users communicated on the Website.

62.    Facebook's Business Help Center explains:

Meta *uses event data to show ads to people who are likely to be interested in them*. One type of marketing data is website events, which are *actions that people take on your website*.[50]

63.    In other words, Facebook sells advertising space by highlighting its ability to target users.[51]  Facebook can target users so effectively because it surveils user activity both on and off its site.[52]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behaviors," and connections.[53]

64.    An example illustrates how the Facebook Tracking Pixel works.  Take an individual who, at relevant times, navigated to the Website and clicked on a link to apply for a credit card.  When that link was clicked, the individual's browser sent a GET request to Synchrony's servers requesting the servers to load the particular webpage.  As a result of Synchrony's use of the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening.  Synchrony intercepted the individual's communication with the Website, giving Facebook the opportunity to secretly duplicate the communication with Synchrony, transmitting it to Facebook's servers, alongside additional information that transcribed the communication's content and the individual's identity.

---

[50] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[51] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706 (last visited May 21, 2024).

[52] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[53] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

65.     After collecting and intercepting the information described in the preceding paragraph, Facebook processed, analyzed, and assimilated it into datasets like Core Audiences and Custom Audiences.

### ii.      Defendant's Use of the Facebook Tracking Pixel

66.     Through the Facebook Tracking Pixel, Defendant Synchrony disclosed its users' identities and online activity, including information related to users' application for a credit card, with the world's largest social media company for targeted advertising purposes.

67.     Defendant allows individuals to apply for credit cards and other financial services on its Website.



*Figure 5*

68.     Defendant offers a host of financial services, including credit card and financing options, and savings products.

69.     Undoubtedly, users applying to receive these financial services, options or products expect this information to remain private and confidential, especially as the application

process requires the submission of employment and personal information.

70.     When a consumer searches for a credit card and begins the application process through the Website, Defendant Synchrony transmits to Facebook through the Facebook Tracking Pixel the fact that: (1) the user is applying for the credit card, (2) the user is progressing through the application process, and (3) whether the user's application has been approved or denied.

71.     For example, Defendant Synchrony incorporated the Facebook Tracking Pixel on the Website, allowing Defendant to intercept and send to Facebook the "Premier_Start_PG," "Premier_StartApplyNow_Button, "Premier_PayfoneMD1a_PG," "Premier_PayfoneMD1a_ContButton," "Premier_OptionStep2_PG," "Premier_OptionStep2_ContButton," "Premier_TermsStep3_PG," "Premier_TermsStep3_Complete Registration," and "Premier_Declined_PG," events, which detail information about the user's progression through the application process on the Website.

```
Facebook - Premier_Start_PG Event
GET   www.facebook.com/tr/?
Mon Sep 08 16:43:32 EDT 2025

Cookies:
datr    4OTSZ9ef0589cPFtW09MTjdy
sb      4OTSZwvtykQc0ErXyOeAy346
ps_n    1
c_user 61557047663647
dpr     1.25
fr
1pfVq528IakbTecy0.AWc3PqzI6i4Svh6SZA6c777G2SxhQ9kkK_Dx44BR0FmBCM34cgo.BotvWg..AAA.0.
0.BotvWg.AWeVIzR7HSUbgznh83TgwqqNIKY
xs
14%3AYwqtQM_4AhUkMw%3A2%3A1743197872%3A-1%3A-1%3A%3AAcXsVvD8x4vP41_gA6j5HWQ4
qrGdxGyGIDEAxACoNg
ar_debug        1

Data:
id      4221750029001998
ev      ViewContent
dl      https%3A%2F%2Fapply.syf.com
rl      https%3A%2F%2Fwww.synchrony.com
if      false
ts      1757364212246
cd[content_ids]     Premier_Start_PG
```

*Figure 6*

Facebook - Lead Event / Premier_StartApplyNow_Button
GET   www.facebook.com/tr/?
Mon Sep 08 16:44:17 EDT 2025

Cookies:
datr      4OTSZ9ef0589cPFtW09MTjdy
sb        4OTSZwvtykQc0ErXyOeAy346
ps_n   1
c_user 61557047663647
dpr      1.25
fr
1pfVq528IakbTecy0.AWc3PqzI6i4Svh6SZA6c777G2SxhQ9kkK_Dx44BR0FmBCM34cgo.BotvWg..AAA.0.
0.BotvWg.AWeVlzR7HSUbgznh83TgwqqNlKY
xs
14%3AYwqtQM_4AhUkMw%3A2%3A1743197872%3A-1%3A-1%3A%3AAcXsVvD8x4vP41_gA6j5HWQ4
qrGdxGyGIDEAxACoNg
ar_debug      1

Data:
id        422175029001998
ev       Lead
dl        https%3A%2F%2Fapply.syf.com
rl        https%3A%2F%2Fwww.synchrony.com
if        false
ts        1757364257659
cd[content_ids]      Premier_StartApplyNow_Button

*Figure 7*

Facebook - Premier_TermsStep3_AcceptOfferButton / CompleteRegistration
GET   www.facebook.com/tr/?
Mon Sep 08 16:48:18 EDT 2025

Cookies:
datr      4OTSZ9ef0589cPFtW09MTjdy
sb        4OTSZwvtykQc0ErXyOeAy346
ps_n   1
c_user 61557047663647
dpr      1.25
fr
1pfVq528IakbTecy0.AWc3PqzI6i4Svh6SZA6c777G2SxhQ9kkK_Dx44BR0FmBCM34cgo.BotvWg..AAA.0.
0.BotvWg.AWeVlzR7HSUbgznh83TgwqqNlKY
xs
14%3AYwqtQM_4AhUkMw%3A2%3A1743197872%3A-1%3A-1%3A%3AAcXsVvD8x4vP41_gA6j5HWQ4
qrGdxGyGIDEAxACoNg
ar_debug      1

Data:
id        422175029001998
ev       CompleteRegistration
dl        https%3A%2F%2Fapply.syf.com
rl        https%3A%2F%2Fapply.syf.com
if        false
ts        1757364498531
cd[content_ids]      Premier_TermsStep3_AcceptOfferButton

*Figure 8*

```
Facebook - Premier_Declined_PG
GET   www.facebook.com/tr/?
Mon Sep 08 16:48:24 EDT 2025

Cookies:
datr    4OTSZ9ef0589cPFtW09MTjdy
sb      4OTSZwvtykQc0ErXyOeAy346
ps_n    1
c_user 61557047663647
dpr     1.25
fr
1pfVq528IakbTecy0.AWc3PqzI6i4Svh6SZA6c777G2SxhQ9kkK_Dx44BR0FmBCM34cgo.BotvWg..AAA.0.
0.BotvWg.AWeVlzR7HSUbgznh83TgwqqNIKY
xs
14%3AYwqtQM_4AhUkMw%3A2%3A1743197872%3A-1%3A-1%3A%3AAcXsVvD8x4vP41_gA6j5HWQ4
qrGdxGyGIDEAxACoNg
ar_debug    1

Data:
id      4221750290001998
ev      ViewContent
dl      https%3A%2F%2Fapply.syf.com
rl      https%3A%2F%2Fapply.syf.com
if      false
ts      1757364504701
cd[content_ids]       Premier_Declined_PG
```

*Figure 9*

72.     Each time Defendant Synchrony intercepted and sent this activity data through the Facebook Tracking Pixel, it also disclosed a Website user's personally identifiable information, including their Facebook ID ("FID"). An FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

73.     A user who accessed the Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contains that user's unencrypted FID.

74.     When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

24

75.     One such cookie was the "fr cookie" which contained, at least, an encrypted FID and browser identifier.[54]  Facebook, at a minimum, used the fr cookie to identify users.[55]

76.     If a visitor had never created an account, an even smaller set of cookies was transmitted.

77.     At each stage, Defendant Synchrony also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[56]

78.     The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[57]  Otherwise, the c_user cookie is cleared when the browser exits.[58]

79.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[59]  If that happens, the time resets, and another 90 days begins to accrue.

80.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[60]  If that happens, the time resets, and another 90 days begins to accrue.

81.     The Facebook Tracking Pixel used both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant Synchrony's Website.[61]  A third-party cookie is "created by a website with a domain name other than the one

---

[54] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[55] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[56] *Id.*

[57] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[58] *Id.*

[59] *See id.*

[60] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://mbasic.facebook.com/privacy/policies/cookies/printable/#annotation-1.

[61] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

the user is currently visiting"—*i.e.*, Facebook.[62]  The _fbp cookie was always transmitted as a first-party cookie.  A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

82.    Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link to FIDs and corresponding Facebook profiles.  Defendant sent these identifiers alongside the event data.

83.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his nonpublic personal information or electronic communications.  Plaintiff was never provided with any written notice that Defendant disclosed nonpublic personal information or electronic communications of users of the Website.  In fact, Defendant's privacy representations on the Website expressly warrant the opposite.

84.    Defendant warrants to Website users that "[w]hen you use our site, it may store or retrieve information about your interactions, your preferences and your device. This information is used to make the site work properly. This information does not directly identify you but provides a more personalized site experience."

85.    Defendant nonetheless knowingly disclosed Plaintiff's nonpublic personal information and intercepted Plaintiff's electronic communications for targeted advertising purposes through its use and integration of the Tracking Technologies on its Website.

86.    By law, Plaintiff is entitled to privacy in his nonpublic personal information electronic communications.  Defendant deprived Plaintiff of his privacy rights when it: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and other users' confidential communications and personally identifiable information; (2) disclosed and/or intercepted Website users' communications and nonpublic personal information; and (3) undertook this pattern of conduct without notifying Plaintiff and without obtaining their express written consent.

---

[62] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure individually and on behalf of the following Classes:

**Nationwide Class:** All natural persons in the United States who, during the class period, applied for a credit card or loan on the Website while maintaining a LinkedIn and/or Facebook account.

**New York Subclass:** All natural persons in the State of New York who, during the class period, applied for a credit card or loan on the Website while maintaining a LinkedIn and/or Facebook account.

88.     Excluded from the Class is Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or had a controlling interest.

89.     Plaintiff is a member of the Class he seeks to represent.

90.     The Class is so numerous that joinder of all members is impractical. Although Plaintiff does not yet know the exact size of the Class, Defendant claims to have "over 100 million consumer credit accounts and $182 billion in purchase volume."[63]

91.     The Class is ascertainable because the Class members can be identified by objective criteria and through Defendant's own recordkeeping. Individual notice can be provided to Class members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

92.     There are numerous questions of law and fact common to the Class, which predominate over any individual actions or issues, including but not limited to:

---

[63] SYNCHRONY, EMPOWERING AMERICANS TO LIVE HEALTHIER FINANCIAL LIVES https://synchronyimpact.com/#:~:text=Our%20impact%20on%20the%20economy,%2D%20and%20mid%2Dsized%20businesses

A.   Whether Defendant gave the Class members a reasonable expectation of privacy that their information was not being shared with third parties;

B.   Whether Defendant's disclosure of information constitutes a violation of the claims asserted;

C.   Whether Plaintiff and Class members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

D.   Whether Plaintiff and Class members have sustained damages as a result of Defendant's conduct and if so, what is the appropriate measure of damages or restitution.

93.   Plaintiff's claims are typical of the claims of the members of the Class, as all members are similarly affected by Defendant's wrongful conduct.  Plaintiff has no interests antagonistic to the interests of the other members of the Class. Plaintiff and all members of the Class have sustained economic injury arising out of Defendant's violations of common and statutory law as alleged herein.

94.   Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

95.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation

increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

96. Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CAUSES OF ACTION

### COUNT I
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1), *et seq.***

97. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

98. Plaintiff brings this claim on behalf of himself and members of the nationwide Class.

99. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

100. The ECPA protects both sending and the receipt of communications.

101. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

102.    The transmission of Plaintiff's PII and financial information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

103.    The transmission of PII and financial information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

104.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

105.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

106.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

107.    The following instruments constitute "devices" within the meaning of the ECPA:

a.    The computer codes and programs that Defendant, LinkedIn and Facebook used to track Plaintiff and Class Members communications while they were navigating the Website;

b.    Plaintiff's and Class Members' browsers;

c.    Plaintiff's and Class Members' mobile devices;

d.    Defendant and Meta's web and ad servers;

e. The plan that Defendant carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications through LinkedIn and Facebook's Tracking Technologies while Plaintiff and Class Members were using a web browser to navigate the Website.

108. Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

109. By utilizing and embedding the tracking technology provided by LinkedIn on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

110. By utilizing and embedding the tracking technology provided by Meta on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

111. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by LinkedIn on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and financial information to third parties, including but not limited to Meta.

112. Similarly, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by Meta on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and financial information to third parties, including but not limited to Meta.

113. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their identities and information related to the specific financial product they were applying for, as well as information related to their citizenship, housing status, and employment information. This confidential information is then monetized for targeted advertising purposes, among other things.

114. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to LinkedIn through the LinkedIn Insight Tag and to Meta through the Facebook Tracking Pixel, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

115. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

116. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, the GBLA and invasion of privacy, among others.

117. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313. This provision imposes a criminal penalty for

knowingly disclosing "nonpublic personal information" to a third party. GLBA defines

nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a financial institution otherwise obtains about a consumer in connection with providing a financial product or service.

118.    Plaintiff's information that Defendant disclosed to Meta and LinkedIn qualifies as nonpublic personal information, and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 16 C.F.R. § 313. Defendant used the electronic communications to increase its profit margins. Defendant specifically used the tracking technology provided by Meta and LinkedIn to track and utilize Plaintiff's and Class Members' PII for financial gain.

119.    Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

120.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendant would not redirect their communications to Meta and LinkedIn without their knowledge or consent.

121.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

122.    As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

## COUNT II
### Violation of GBL § 349
### (On Behalf of the New York Subclass)

123. Plaintiff incorporates by reference and realleges the allegations above as if fully set forth herein.

124. Plaintiff brings this claim individually and on behalf of the New York Subclass against Defendant.

125. Defendant committed deceptive acts, practices or omissions by employing false, misleading and deceptive representations about what information it collects from Plaintiff and other financial product applicants when they use Defendant's Website.

126. Defendant further committed deceptive acts, practices or omissions by employing false, misleading and deceptive representations about whether Plaintiff and other financial product applicants' information would be used to identify them.

127. Defendant further committed deceptive acts, practices or omissions by employing false, misleading and deceptive representations concerning its rationale for sending Plaintiff and other financial product applicants' information to third parties.

128. Specifically, Defendant represents that it collects Plaintiff and other financial product applicants' information to make its site work correctly and represents that the information it collects will not directly identify Plaintiff and other financial product applicants.

129. Upon information and belief, these representations are untrue, because Defendant collects from Plaintiff and other financial product applicants personally identifiable information that is associated with their Facebook and/or LinkedIn social media accounts.

130. The personally identifiable information that Defendant is collecting is not aggregated, anonymized web-browsing data, but information that is capable of identifying Plaintiff and/or financial product applicants individually.

34

131.    By collecting this personally identifiable information, despite Defendant's express representations, Defendant is tracking Plaintiff and other financial product applicants' information for reasons that go beyond improving the Website's functionality.

132.    Defendant's deceptive acts and practices were directed at consumers.

133.    Defendant's deceptive acts and practices were misleading in a material way because they fundamentally misrepresent whether they collect personally identifiable information from Plaintiff and other financial product applicants, and they fundamentally misrepresent the ways in which that information is used.

134.    As a direct and proximate result of Defendant's false, misleading and deceptive representations, Plaintiff and New York Subclass Members were injured in that they would not have used the Defendant's Website, applied for financial products such as the Synchrony Premier World Mastercard on Defendant's Website, and provided Defendant with an opportunity to intercept and transmit their personally identifiable information to third parties if they had known that Defendant's representations about its data collection processes were false.

135.    On behalf of himself and the New York Subclass, Plaintiff seeks to recover his actual damages or fifty (50) dollars per violation, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action;

b.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and naming Plaintiff's attorneys as Class Counsel to represent the Class;

35

c.     For an order declaring that Defendant's conduct violates the statutes referenced herein;

d.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e.     Award compensatory damages, including statutory damages where available, to Plaintiff and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.     Ordering Defendant to disgorge revenues and profits wrongfully obtained;

g.     For prejudgment interest on all amounts awarded;

h.     For injunctive relief ordering Defendant to immediately cease its illegal conduct;

i.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

j.     Grant Plaintiff and the Class members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated: October 28, 2025                     Respectfully submitted,

By: */s/ Philip L. Fraietta*

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
50 Main St., Suite 475
White Plains, NY 10606
Tel: (914)-874-0708
Fax: (914)-206-3656
E-Mail: pfraietta@bursor.com

Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: aleslie@bursor.com

*Attorneys for Plaintiff*